IN THE SUPREME COURT OF THE STATE OF DELAWARE

IN RE MATCH GROUP, INC. DERIVATIVE LITIGATION

§
§ No. 368, 2022
§
§ Court Below: Court of Chancery
§ of the State of Delaware
§
§ C.A. No. 2020-0505
§ CONSOLIDATED
§

Submitted: December 13, 2023
Decided: April 4, 2024

Before **SEITZ**, Chief Justice; **VALIHURA**, **TRAYNOR**, **LEGROW**, and **GRIFFITHS**, Justices; constituting the Court *en Banc*.

Upon appeal from the Court of Chancery. **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED**.

Michael Hanrahan, Esquire (*argued*), J. Clayton Athey, Esquire, Corinne Elise Amato, Esquire, Kevin H. Davenport, Esquire (*argued*), Stacey A. Greenspan, Esquire, Jason W. Rigby, Esquire, PRICKETT, JONES & ELLIOTT, P.A., Wilmington, Delaware; Lee D. Rudy, Esquire, Eric L. Zagar, Esquire, J. Daniel Albert, Esquire, Maria T. Starling, Esquire, KESSLER TOPAZ MELTZER & CHECK, LLP, Radnor, Pennsylvania *for Plaintiffs Below/Appellants*.

Robert D. Klausner, Esquire, KLAUSNER, KAUFMAN, JENSEN & LEVINSON, Plantation, Florida *for Plaintiff Below/Appellant Hallandale Beach Police Officers' and Firefighters' Personnel Retirement Trust*.

William M. Lafferty, Esquire, John P. DiTomo, Esquire, Elizabeth A. Mullin, Esquire, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Theodore N. Mirvis, Esquire (*argued*), Jonathan M. Moses, Esquire, Ryan A. McLeod, Esquire, Alexandra P. Sadinsky, Esquire, Canem Ozyildirim, Esquire, WACHTELL, LIPTON, ROSEN & KATZ, New York, New York *for Defendants Below/Appellees Barry Diller, Joey Levin, Glenn Schiffman, Mark Stein, Gregg Winiarski, and IAC Holdings, Inc. (now known as IAC Inc.)*.

Blake Rohrbacher, Esquire, Matthew W. Murphy, Esquire, Sandy Xu, Esquire, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Maeve O'Connor, Esquire (*argued*), Susan R. Gittes, Esquire, Amy C. Zimmerman, Esquire, DEBEVOISE & PLIMPTON LLP, New York, New York *for Defendants Below/Appellees Ann L. McDaniel, Thomas J. McInerney, and Pamela S. Seymon*.

David E. Ross, Esquire, Adam D. Gold, Esquire, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; Joshua G. Hamilton, Esquire, Meryn C.N. Grant, Esquire, LATHAM & WATKINS LLP, Los Angeles, California; Blair Connelly, Esquire, LATHAM & WATKINS LLP, New York, New York; Michele D. Johnson, Esquire LATHAM & WATKINS LLP, Costa Mesa, California *for Defendants Below/Appellees IAC/InterActive Corp. (now known as Match Group, Inc.), Sharmistha Dubey, Amanda Ginsberg, Alan G. Spoon, and Match Group, Inc. (now merged into Match Group Holdings II, LLC)*.

Gregory V. Varallo, Esquire, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, Wilmington, Delaware; Mark Lebovitch, Esquire, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, New York, New York *for Amicus Curiae, Academics, in support of Appellants*.

Ned Weinberger, Esquire, Mark Richardson, Esquire, Brendan W. Sullivan, Esquire, LABATON SUCHAROW LLP, Wilmington, Delaware; John Vielandi, Esquire, Joshua M. Glasser, Esquire, LABATON SUCHAROW LLP, New York, New York *for Amicus Curiae, Alpha Venture Capital Management, LLC, in support of Appellants*.

Kimberly A. Evans, Esquire, BLOCK & LEVITON LLP, Wilmington, Delaware; Joel Fleming, Esquire, Amanda Crawford, Esquire, BLOCK & LEVITON LLP, Boston, Massachusetts *for Amicus Curiae, Charles M. Elson, in support of Appellants*.

2

**SEITZ**, Chief Justice:

This appeal arises from a Court of Chancery decision dismissing a stockholder suit challenging the fairness of IAC/InterActiveCorp's separation from its controlled subsidiary, Match Group, Inc. Through a reverse spinoff, IAC/InterActiveCorp separated its internet and media businesses from Match and other online dating businesses. In their complaint, the plaintiffs alleged that the transaction was unfair because IAC/InterActiveCorp, a controlling stockholder of Match, received benefits in the transaction at the expense of the Match minority stockholders.

Typically, the court would apply entire fairness review to assess whether the reverse spinoff transaction was fair to the Match stockholders. But the defendants claimed that business judgment review applied because they followed the so-called *MFW* framework,[1] which included approval by an independent and disinterested "separation committee" and a majority of uncoerced, fully informed, and unaffiliated Match stockholders. The Court of Chancery agreed and dismissed the complaint.

There are two main issues on appeal. First is the standard of review. We requested supplemental briefing to answer the following question: for a controlling stockholder transaction that does not involve a freeze out merger, like the transaction here, does the entire fairness standard of review change to business judgment if a

---

[1] *Kahn v. M & F Worldwide Corp.*, 88 A.3d 635 (Del. 2014).

3

defendant shows either approval by an independent special committee or approval by an uncoerced, fully informed, unaffiliated stockholder vote. If the answer is no, then we move to the second question: whether IAC/InterActiveCorp satisfied all *MFW*'s requirements to invoke business judgment review.

For the first question, we conclude, based on long-standing Supreme Court precedent, that in a suit claiming that a controlling stockholder stood on both sides of a transaction with the controlled corporation and received a non-ratable benefit, entire fairness is the presumptive standard of review. The controlling stockholder can shift the burden of proof to the plaintiff by properly employing a special committee or an unaffiliated stockholder vote. But the use of just one of these procedural devices does not change the standard of review. If the controlling stockholder wants to secure the benefits of business judgment review, it must follow all *MFW*'s requirements. Of course, derivative claims against controlling stockholders, which typically arise from ordinary course transactions such as compensation decisions and intercompany agreements, are subject to Court of Chancery Rule 23.1 and our demand review precedent.

For the second question, the separation committee must have functioned as an independent negotiating body. We agree with the Court of Chancery that the plaintiffs have alleged that Thomas McInerney, a separation committee member, lacked independence from IAC/InterActiveCorp. We reverse its finding, however,

4

that the separation committee functioned as an independent negotiating body. In the *MFW* setting, to replicate arm's length bargaining, all separation committee members must be independent of the controlling stockholder. The plaintiffs have adequately alleged that the defendants have not satisfied the *MFW* framework. For the remaining issues, we affirm the Court of Chancery's rulings.

## I.

## A.

According to the allegations of the amended and supplemental complaint, Old IAC was a Delaware internet and media company.[2] In 1999, Old IAC, through one of its subsidiaries, acquired the Match.com business, a market leader in online dating products in the United States and Europe.[3] In 2009, Old IAC incorporated in Delaware a new subsidiary, Old Match, to hold the Match.com business and the other dating platforms held by Old IAC.[4] In 2015, Old Match offered shares to the

---

[2] App. to Opening Br. at A770 [hereinafter "A__"]. The facts are drawn from the Amended and Supplemental Certified Consolidated Stockholder Class Action and Derivative Complaint filed on November 2, 2021 (the "Am. Compl."), the joint proxy statement/prospectus that the Old Match and Old IAC Boards issued on April 30, 2020 (the "Proxy"), and other documents incorporated by reference in the amended and supplemental complaint or cited by the Court of Chancery. In this opinion, pre-separation Match Group, Inc. will be referred to as "Old Match;" post-separation IAC/InterActiveCorp (now known as Match Group, Inc.) as "New Match;" pre-separation IAC/InterActiveCorp as "Old IAC;" and IAC Holdings Inc. (now known as IAC Inc.) as "New IAC."

[3] A240 (Proxy at 139).

[4] *Id.*

public through an initial public offering (IPO) of its common stock.[5]  At the time of the reverse spinoff, Old IAC held 98.2% of Old Match's voting power through ownership of 24.9% of Old Match's common stock, and all of Old Match's Class B high-vote common stock.[6]

On August 7, 2019, Old IAC announced in a letter to its stockholders that it was considering separating from Old Match.[7]  Soon after, Barry Diller – Chairman, Senior Executive, and large stockholder of Old IAC – told Old IAC's board that he would support a reverse spinoff of Old IAC from Old Match's businesses.[8]  With a deal now likely, the Old IAC board conveyed to Old Match that any transaction would be conditioned from the start upon both the recommendation of an Old Match board special committee and the approval of the holders of a majority of the shares held by Old Match's unaffiliated stockholders.[9]

The Old Match board appointed directors Thomas McInerney, Pamela Seymon, and Ann McDaniel to a "Separation Committee" to assess a proposed

---

[5] *Id*.

[6] A62 (Proxy at 1); A892.

[7] A241 (Proxy at 140).

[8] *Id*.

[9] *Id.*

transaction.[10] McInerney was Old IAC's former CFO and, at the time, CEO of Altaba, Inc. (formerly Yahoo! Inc.).[11] The Old Match board empowered the Separation Committee to retain its own financial and legal advisors, "oversee and consider" potential separation transactions with Old IAC, and in its "sole discretion" to direct, negotiate, and approve or disapprove any separation transaction.[12]

The Separation Committee retained Debevoise & Plimpton LLP as its counsel and selected Goldman Sachs & Co. LLC as its financial adviser.[13] Old IAC delivered its initial proposal to Debevoise. The proposal envisioned creating two separate public companies and eliminating Old Match's dual-class capital structure (the "Separation"). All Old Match and Old IAC stockholders would receive stock in New Match with voting power of one vote per share. The initial proposal allocated various assets and liabilities between New IAC and New Match and required New Match to retain and guarantee debt in the form of around $1.7 billion worth of exchangeable notes issued by certain financing subsidiaries of Old IAC (the

---

[10] B106.

[11] Joint Appellee's App. at B230–31 [hereinafter "B__"] (Match Group, Inc., Annual Report Amendment No. 1 (Form 10-K/A) (Apr. 29, 2020), at 4–5 [hereinafter "2019 Form 10-K/A"]).

[12] B106–07.

[13] A243 (Proxy at 142).

"Exchangeables").[14]   Additionally, Old Match would issue a $2 billion dividend to its stockholders before the Separation, which would be financed with $1.8 billion of new debt.[15]  Old IAC, as Old Match's majority stockholder, would receive most of the dividend proceeds.  The proposal conditioned closing on approval by a majority of the shares held by disinterested Old Match stockholders.[16]

In the ensuing months, McInerney met several times with Joey Levin, Old IAC's CEO, and reported back to the full Separation Committee.[17]  A day before the Separation Committee and Old IAC reached preliminary agreement, the Separation Committee "determined" that McInerney should be the one to "convey the Committee's" counterproposal to Levin.[18]  On November 22, 2019, McInerney and Levin spoke by telephone and "reached a preliminary agreement on the remaining open key transaction terms."[19]  The preliminary agreement differed from the initial

---

[14] A244 (Proxy at 143).  The Exchangeables were convertible into shares of Old IAC stock prior to the Separation and into shares of New Match stock following the Separation.  A160 (Proxy at 61); B112.

[15] A244 (Proxy at 143).

[16] Id.

[17] B186–87, 189, 192, 195–96.

[18] B196.

[19] A250 (Proxy at 149).

proposal by reducing the Old Match dividend to $850 million, and allocating an additional 2% of equity in New Match to the Old Match stockholders.[20]

B.

On December 18, 2019, the parties reached a final agreement.[21] The Separation Committee recommended that the Old Match board approve the Separation.[22] The next day, following the Old IAC board's "approval by unanimous written consent . . . [of Old] IAC's entry into the transaction agreement and ancillary agreements," the parties entered into the agreements to carry out the Separation.[23]

The proxy described the transaction as follows:

- New Match will be reclassified into a widely held public corporation with a single class of common stock and no controlling stockholder;[24]

- Old IAC's stockholders will receive stock in New IAC and New Match based on an exchange ratio adjusted for the rest of the consideration comprising the Separation;[25]

---

[20] *Id.*; B112; A283–84 (Proxy at 182–83).

[21] A253 (Proxy at 152).

[22] *Id.*

[23] *Id.* The parties amended the agreement twice before Old IAC and Old Match stockholders voted on the Separation. The first amendment revised the method for calculating the equity offering associated with the Separation along with other governance restrictions on Match. Match Group, Inc., Current Report (Form 8-K) (Apr. 28, 2020), at Ex. 2.1. The second amendment revised the treatment of fractional shares that would otherwise be issuable in the reverse spinoff. Match Group, Inc., Current Report (Form 8-K) (June 22, 2020), at Ex. 2.1.

[24] A62 (Proxy at 1).

[25] *Id.*

9

- Old Match's minority stockholders will receive, in exchange for one share of their common stock, the right to receive one share of New Match common stock and, at the holder's election either $3.00 in cash or a fraction of a share of New Match stock with a value of $3.00;[26]

- Old Match will issue an $850 million dividend to its existing stockholders, with Old IAC receiving approximately $680 million of that amount because of its equity in Old Match. New IAC will retain the dividend proceeds;[27]

- New Match will retain and guarantee various Old IAC debt obligations, including the Exchangeables, which are valued at about $1.7 billion;[28]

- New Match would be subject to certain governance restrictions, giving New IAC a degree of control over New Match for the near future;[29] and

- Old IAC would have the right to engage in an equity offering where it may raise $1.5 billion for New IAC by selling shares of Old IAC stock convertible into shares of New Match stock following completion of the Separation.[30] The proceeds of the equity offering would be transferred into New IAC.

The Old IAC stockholder exchange ratio was based on the number of outstanding shares of Old Match capital stock owned by Old IAC, plus the value of the tax attributes left behind in the reverse spinoff, minus: (i) the value of the Exchangeables; (ii) the number shares sold in the equity offering; (iii) a portion of

---

[26] *Id.*

[27] A250 (Proxy at 149).

[28] A158 (Proxy at 59).

[29] A107 (Proxy at 9).

[30] A239 (Proxy at 138).

10

the cost of New Match stock options to be received by New IAC employees in place of their existing Old IAC stock options; and (iv) the number of shares of New Match stock issued to non-IAC stockholders of New Match in respect of additional stock elections and non-elections.[31]

At their respective special meetings, the stockholders of Old IAC and Old Match voted in favor of the Separation and its related transactions.[32] On June 30, 2020, Old IAC carried out the Separation.[33] New IAC was spun-off from Old IAC.[34] Old Match was merged into a subsidiary held by Old IAC, and therefore ceased to exist as a legal entity.[35] Old IAC was renamed to Match Group, Inc., and reclassified into a corporation with one class of common stock, thereby becoming New Match.[36] Old IAC stockholders received shares in both New IAC and New Match. Old Match minority stockholders received shares in New Match.[37] The New Match minority stockholders now owned common stock in a widely held and highly leveraged

---

[31] A281–83 (Proxy 180–82).

[32] Match Group, Inc., Current Report (Form 8-K) (June 29, 2020), at Item 5.07; IAC/InterActiveCorp, Current Report (Form 8-K) (June 29, 2020), at Item 5.07.

[33] Match Group, Inc., Quarterly Report (Form 10-Q) (Aug. 10, 2020), at 11.

[34] *Id.*

[35] *Id.*; A238 (Proxy at 137).

[36] A62 (Proxy at 1).

[37] *Id.*

corporation, subject to short-term restrictive governance provisions. The New Match minority stockholders also gained an additional 2% of the Match business. IAC stockholders received most of the interest in New Match, as well as shares in a cash-rich corporation with little to no debt, New IAC.

C.

Former Old Match stockholders challenged the Separation in the Court of Chancery. In their complaint, plaintiffs Construction Industry and Laborers Joint Pension Trust for Southern Nevada Plan A ("Nevada") and Hallandale Beach Police Officers' and Firefighters' Personnel Retirement Trust ("Hallandale") alleged that the Separation was a conflicted transaction in which Old IAC, as Old Match's controlling stockholder, stood on both sides of the transaction.[38] The plaintiffs claimed that Old IAC obtained significant non-ratable benefits in the Separation to the detriment of Match and its minority stockholders. They argued that the Separation Committee was conflicted and that the proxy disclosures misled the Old Match minority stockholders.[39] Count I alleged direct and class breach of fiduciary duty claims against Old IAC as Old Match's controlling stockholder, and Diller as Old IAC's alleged controlling stockholder.[40] Count III alleged direct and class

---

[38] A746 (Am. Compl.).

[39] A788, 841 (Am. Compl. ¶¶ 67, 165).

[40] A868–69 (Am. Compl. ¶¶ 226–32).

12

breach of fiduciary duty claims against the directors of Old Match.[41]  Counts II and IV were derivative claims that mirror Counts I and III, respectively.[42]  The plaintiffs alleged that an unfair process yielded an unfair price to the detriment of Old Match's minority stockholders.[43]  They claimed that the Separation left Old Match's minority with a "slightly larger piece of a much less substantial pie."[44]

The Court of Chancery granted the defendants' motion to dismiss the complaint.[45]  First, the court held that the plaintiffs could not bring derivative claims on behalf of Old Match because they lost derivative standing when Old Match ceased to exist.[46]  The court then determined that the plaintiffs did not plead an exception to the contemporaneous ownership requirement for derivative standing.[47]  And the court held that Nevada lacked standing to bring direct claims as it sold its New Match

---

[41] A870–71 (Am. Compl. ¶¶ 239–45).  The director defendants are Sharmistha Dubey, Amanda Ginsberg, Joey Levin, Ann McDaniel, Thomas McInerney, Pamela Seymon, Glenn Schiffman, Alan Spoon, Mark Stein, and Gregg Winiarski.

[42] A869–70 (Am. Compl. ¶¶ 233–38); A871–72 (Am. Compl. ¶¶ 246–52).

[43] A836–48 (Am. Compl. ¶¶ 157–79).

[44] A848 (Am. Compl. ¶ 179).

[45] *In re Match Grp., Inc. Derivative Litig.*, 2022 WL 3970159 (Del. Ch. Sept. 1, 2022) [hereinafter *In re Match*].

[46] *Id.* at *11.

[47] *Id.* at *13.

stock.[48]  The only claims that survived the standing analysis were the direct claims

brought by Hallandale.[49]

Next, the Court of Chancery held that the defendants satisfied *MFW*'s

requirements which led to business judgment review.[50]  According to the court, the

Separation conditioned the transaction on the approvals of a fully empowered, well-

functioning special committee of independent directors and the uncoerced, fully-

informed vote of the minority stockholders.[51]  Although the court found that the

plaintiffs successfully pleaded facts creating a reasonable inference that McInerney

was not independent of Old IAC, the court ruled that a plaintiff must nonetheless

show that "either (i) 50% or more of the special committee was not disinterested and

independent,"[52] or "(ii) the minority of the special committee 'somehow infect[ed]'

or 'dominate[ed]' the special committee's decisionmaking [*sic*] process."[53]  Because

---

[48] *Id.* at *14.

[49] For convenience, this decision will continue to refer to Nevada and Hallandale as the plaintiffs, even though the Court of Chancery dismissed Nevada from the litigation.

[50] *Id.* at *15 (citing *MFW*, 88 A.3d 635).

[51] *Id.*

[52] *Id.* at *16 (citing *In re Dell Techs. Inc. Class V S'holders Litig.*, 2020 WL 3096748, at *35 (Del. Ch. June 11, 2020)).

[53] *Id.* (quoting *In re GGP, Inc. S'holder Litig.*, 2021 WL 2102326, at *15 (Del. Ch. May 25, 2021), *aff'd in part, rev'd in part on other grounds, and remanded*, 2022 WL 2815820 (Del. July 19, 2022)).

the plaintiffs failed to do so, the court found that the Separation Committee was independent under *MFW*'s requirements.

The court then held that the minority stockholder vote was fully-informed.[54] The court determined that the facts pertinent to McInerney's conflicts were material and that the defendants fully disclosed them.[55] While the facts of McInerney's employment history and board service with Old IAC and its affiliates were not disclosed in the Proxy itself, the Proxy incorporated Old Match's 2019 Form 10-K, which disclosed McInerney's ties to Old IAC.[56] The court also found that the disclosures were sufficient to address the plaintiffs' concerns about the effect of two prior agreements regarding investor rights and tax sharing between Old IAC and Old Match on the Separation's negotiations.[57] Finally, the court found that any disclosures about a purported subjective belief regarding the motivation behind the governance provisions following the Separation would not be material.[58]

---

[54] *Id.* at *26.

[55] *Id.*

[56] *Id.* at *28–29 (citing Proxy at 1–2, 19, 308–09).

[57] *Id.* at *30–32.

[58] *Id.* at *32.

15

Having found the *MFW* framework satisfied, the court applied the business judgment standard of review and dismissed the case.[59]

## II.

On appeal, the plaintiffs argue first that the Court of Chancery erred when it found that Old IAC satisfied *MFW*'s independent committee requirement.[60] As they argue, the policy-rationale underlying the *MFW* framework – replicating arm's length bargaining by removing the influence of the controlling stockholder – requires that every director on the committee be independent.[61] In the alternative, the plaintiffs claim that they pleaded that McInerney dominated the committee's process and improperly influenced the negotiations.[62]

Second, the plaintiffs contend that the Old Match stockholder vote was not fully informed, as required by *MFW*.[63] They claim that the Proxy did not disclose material information about McInerney's conflicts, either directly or through incorporated public filings. Finally, the plaintiffs argue that the court erred by ruling that they lacked standing to pursue derivative claims, because the Separation was a

---

[59] *Id.* at *33.

[60] Opening Br. at 17. The plaintiffs did not appeal the dismissal of Nevada's direct or derivative claims.

[61] *Id.* at 23.

[62] *Id.* at 31.

[63] *Id.* at 36.

"mere reorganization" of Old Match – an exception to the contemporaneous ownership requirement for derivative standing.[64]

The defendants respond that the Court of Chancery correctly applied existing precedent when it decided that the *MFW* framework does not require that each member of the Committee be independent.[65] And, regardless, McInerney was independent.[66] As they argue, even though McInerney worked as Old IAC's Chief Financial Officer and served on the boards of various Old IAC affiliates other than Match, those relationships ended many years before the Separation and were therefore stale and mere past business relationships.[67] Further, according to the defendants, the plaintiffs did not allege that McInerney had close personal ties to either Old IAC or Diller.[68] They also contend that the court correctly found that the plaintiffs did not plead facts supporting a reasonable inference that McInerney dominated or infected the Separation Committee's work.[69]

---

[64] *Id.* at 41.

[65] Answering Br. of Sharmistha Dubey *et al.* at 23; Answering Br. of Barry Diller *et al.* at 6.

[66] Answering Br. of Sharmistha Dubey *et al.* at 17.

[67] *Id.* at 18–19.

[68] *Id.*

[69] *Id.* at 32.

As for disclosure, the defendants argue that Old Match's 2019 Form 10K/A, which was incorporated into the Proxy, included all material information about McInerney's ties to Old IAC.[70]  And in any event, they claim that McInerney's ties to Old IAC were immaterial because he was independent of Old IAC.

The defendants also argue two alternative grounds for affirmance.  First, they claim that the Separation need not employ both of *MFW*'s procedural safeguards to change the standard of review to business judgment.[71]  According to the defendants, Supreme Court and Court of Chancery precedent recognizes a distinction between controlling stockholder freeze out transactions, and other controlling stockholder transactions.[72]  They contend that, because the Separation was not a freeze out, business judgment review governs if the controlling stockholder employs *either* of the independent committee or minority vote procedural devices.  And second, they claim that the amended and supplemental complaint fails to plead facts supporting an inference that the Separation was unfair to the Old Match stockholders.[73]

---

[70] *Id.* at 36; Answering Br. of Barry Diller *et al.* at 6.

[71] Answering Br. of Barry Diller *et al.* at 8; Answering Br. of Sharmistha Dubey *et al.* at 7.

[72] Answering Br. of Barry Diller *et al.* at 8; Supplemental Opening Br. at 9.

[73] Answering Br. of Barry Diller *et al.* at 23; Answering Br. of Sharmistha Dubey *et al.* at 7.

18

Finally, Diller and IAC argue that we should dismiss all claims against Diller because the complaint fails to plead facts showing he was an Old Match controlling stockholder.[74]

We review the Court of Chancery's motion to dismiss decision *de novo*.[75] We accept all well pleaded factual allegations as true.[76] Even if these allegations are vague, they will be considered "well pleaded" if they provide the opposing party with notice of the claim.[77] We do not, however, accept conclusory factual allegations unsupported by specific facts.[78] But we do draw all reasonable inferences that logically flow from the well pleaded factual allegations in favor of the non-moving party.[79] The Court of Chancery's judgment will be affirmed only if the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances.[80]

---

[74] Answering Br. of Barry Diller *et al.* at 43.

[75] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011) (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896 (Del. 2002)).

[76] *Id.*

[77] *Id.*

[78] *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009).

[79] *Cent. Mortg. Co.*, 27 A.3d at 535; *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d at 895.

[80] *Cent. Mortg. Co.*, 27 A.3d at 535.

III.

Under Section 141(a) of the Delaware General Corporation Law ("DGCL"), "[t]he business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors."[81] With the separation of ownership from legal control over the corporation's business and affairs, "[t]he board of directors has the legal responsibility to manage the business of a corporation for the benefit of its shareholder owners."[82] Accordingly, "fiduciary duties are imposed on the directors of Delaware corporations to regulate their conduct when they discharge that function."[83] When directors manage the corporation's business and affairs, they must execute their responsibilities with care and loyalty to the corporation and its stockholders.[84]

Through standards of review, Delaware courts review directors' conduct for compliance with their fiduciary duties. The default standard of review is the business judgment rule, which is a "presumption that in making a business decision[,] the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the

---

[81] 8 *Del. C.* § 141(a).

[82] *Malone v. Brincat*, 722 A.2d 5, 9 (Del. 1998) ("One of the fundamental tenets of Delaware corporate law provides for a separation of control and ownership.").

[83] *Id.*

[84] *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006).

company."[85]   If the business judgment standard of review applies, a court will not second guess the decisions of disinterested and independent directors.   The reviewing court will only interfere if the board's decision lacks any rationally conceivable basis, thereby resulting in waste or a lack of good faith.[86]

When a stockholder challenges a board's business decision, the plaintiff must rebut the business judgment rule.   The plaintiff must plead particularized facts supporting a reasonable inference that the board or its committee lacked a majority of informed, disinterested individuals who acted in good faith when making a decision.[87]   A plaintiff bringing derivative claims must also show that it would be futile to make a litigation demand on the board.[88]   If the plaintiff rebuts the business judgment rule, the court will review the challenged act by applying the entire fairness standard of review.[89]

---

[85] *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244, 253–54 (Del. 2000).

[86] *Brehm*, 746 A.2d at 264 ("Irrationality may be the functional equivalent of the waste test or it may tend to show that the decision is not made in good faith, which is a key ingredient of the business judgment rule.").

[87] *Id.* at 253; *Aronson*, 473 A.2d at 812–13.

[88] Ct. Ch. R. 23.1; *United Food & Com. Workers Union & Participating Food Indus. Emps. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1047 (Del. 2021).

[89] *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1162 (Del. 1995).

To satisfy entire fairness review, the defendants bear the burden of demonstrating that the corporate act being challenged is entirely fair to the corporation and its stockholders.[90] In our recent decision in *In re Tesla Motors, Inc. S'holder Litig.*, we relied on *Weinberger v. UOP, Inc.* to define entire fairness:

> The concept of fairness has two basic aspects: fair dealing and fair price. The former embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained. The latter aspect of fairness relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock. However, the test for fairness is not a bifurcated one as between fair dealing and price. All aspects of the issue must be examined as a whole since the question is one of entire fairness.[91]

As noted above, entire fairness is a unitary test, under which a reviewing court will scrutinize both the price and the process elements of the transaction as a whole.[92]

Even though business judgment is the default standard of review, the level of judicial scrutiny increases in certain situations when the danger of conflicts is inherent in the board's decision-making process. For instance, during contested director elections and other contests for control, directors might be improperly

---

[90] *In re Tesla Motors, Inc. S'holder Litig.*, 298 A.3d 667, 700 (Del. 2023) (citing *Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983)) [hereinafter *In re Tesla Motors*].

[91] *Id.*

[92] *Id.*

22

motivated to preserve their positions rather than to act in the best interest of the corporation and its stockholders.[93] Recognizing the inherent potential for conflicts, a reviewing court will apply an enhanced scrutiny standard of review.[94] And where a controlling stockholder transacts with the controlled corporation and receives a non-ratable benefit, the presumptive standard of review is entire fairness.[95]

Controlling stockholders are at times free to act in their own self-interest.[96] But a controlling stockholder is a fiduciary and must be fair to the corporation and its minority stockholders when it stands on both sides of a transaction and receives

---

[93] *Coster v. UIP Cos., Inc.*, 300 A.3d 656, 667–68 (Del. 2023) (noting the "'omnipresent specter'" that a board may be acting primarily in its own interests "'rather than those of the corporation and its shareholders'" (quoting *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946 (Del. 1985)).

[94] *See id.* at 673 (applying enhanced scrutiny to a stock sale during a contested board election); *Unocal Corp.*, 493 A.2d 946 (applying enhanced scrutiny to a corporation's self-tender which excluded from participation a stockholder making a hostile tender offer); *Revlon, Inc. v. MacAndrews & Forbes Hldgs., Inc.*, 506 A.2d 173 (Del. 1986) (applying enhanced scrutiny to a board's adoption of defensive measures to thwart an active auction for the company).

[95] *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971) ("When the situation involves a parent and a subsidiary, with the parent controlling the transaction and fixing the terms, the test of intrinsic fairness, with its resulting shifting of the burden of proof, is applied." (citing *Sterling v. Mayflower Hotel Corp.*, 93 A.2d 107 (Del.1952) [hereinafter *Mayflower*])).

[96] *See Bershad v. Curtiss-Wright Corp.*, 535 A.2d 840, 845 (Del. 1987) ("Stockholders in Delaware corporations have a right to control and vote their shares in their own interest. They are limited only by any fiduciary duty owed to other stockholders. It is not objectionable that their motives may be for personal profit, or determined by whim or caprice, so long as they violate no duty owed other shareholders."); *see also Williams v. Geier*, 671 A.2d 1368, 1384 (Del. 1996) (holding that a presumptive controlling bloc was free to vote their shares as they saw fit as long as the underlying act did not entail "waste, fraud, or manipulative or other inequitable conduct").

a non-ratable benefit.[97]  In such cases, the controlling stockholder bears the burden

of demonstrating "the most scrupulous inherent fairness of the bargain."[98]

This is because, without arm's length negotiation, controlling stockholders

can exert outsized influence over the board and minority stockholders.  In *Summa*

*Corp. v. Trans World Airlines, Inc.*, a case that dealt with a controlling stockholder

transaction not involving a freeze out merger, we looked to our iconic cases and

explained that:

> It is well established in Delaware that one who stands on both sides of
> a transaction has the burden of proving its entire fairness. *Weinberger
> v. UOP, Inc.*, Del.Supr., 457 A.2d 701, 710 (1983); *Sterling v.
> Mayflower Hotel Corp.*, Del.Supr., 33 Del.Ch. 293, 93 A.2d 107, 110
> (1952). In the absence of arm's length bargaining, clearly the situation
> here, this obligation inheres in, and invariably arises from the parent-
> subsidiary relationship. *Weinberger v. UOP, Inc.*, at 709, n. 7, 709–710;
> *Rosenblatt v. Getty Oil Co.*, Del.Supr., 493 A.2d 929, 937–38 (1985).
> This rule applies when "the parent, by virtue of its domination of the
> subsidiary, causes the subsidiary to act in such a way that the parent
> receives something from the subsidiary to the exclusion of, and
> detriment to the minority stockholders of the subsidiary." *Sinclair Oil*,
> 280 A.2d at 720.[99]

Although close scrutiny is required for transactions where the controlling

stockholder receives a non-ratable benefit, it is important to recognize that "an

---

[97] *Mayflower*, 93 A.2d at 109–10.

[98] *Weinberger*, 457 A.2d at 710 ("The requirement of fairness is unflinching in its demand that where one stands on both sides of a transaction, he has the burden of establishing its entire fairness, sufficient to pass the test of careful scrutiny by the courts." (citing *Mayflower*, 93 A.2d at 110)).

[99] 540 A.2d 403, 406–07 (Del. 1988).

interest conflict is not in itself a crime or a tort or necessarily injurious to others."[100]

In other words, "having a 'conflict of interest' is not something one is 'guilty of.'"[101]

Indeed, a corporation and its stockholders may benefit from a controlling

stockholder's influence.[102] Through the evolution of our law in three important

decisions, the Supreme Court provided guidance to directors and controlling

stockholders about how to navigate judicial review of controlling stockholder

transactions.

First, in *Weinberger v. UOP, Inc.*, our Court reaffirmed that entire fairness

applies to a controlling stockholder freeze out merger transaction when the

controlling stockholder receives a non-ratable benefit.[103] But "where corporate

action has been approved by an informed vote of a majority of the minority

shareholders . . . the burden entirely shifts to the plaintiff to show that the transaction

---

[100] 2 Model Bus. Corp. Act. Annotated §§ 8.60–8.63 Introductory Comment at 8-387 (3d ed. 1996).

[101] *Id.*

[102] *See, e.g.*, Ronald J. Gilson*, Controlling Shareholders and Corporate Governance: Complicating the Comparative Taxonomy*, 119 HARV. L. REV. 1641, 1642 & 1657 (2006) ("In an efficient controlling shareholder system, concentration of control operates as a cost-effective response to the managerial agency cost problem. It is observed when the benefits of more focused monitoring exceed the limited extraction of private benefits of control allowed in a country with functionally good law."); Albert H. Choi, *Concentrated Ownership and Long-Term Shareholder Value*, 8 HARV. BUS. L. REV. 53 (2018) (discussing situations where private benefits stemming from a controlling interest may create a lock-in effect, and thereby incentivize the controlling stockholder to maximize the long-term value of the enterprise).

[103] 457 A.2d at 710.

was unfair to the minority."[104]  The Court also commented on the benefits of an independent special committee in controlling stockholder transactions:

> Although perfection is not possible, or expected, the result here could have been entirely different if [the controlling stockholder] had appointed an independent negotiating committee of its outside directors to deal with [the controlled subsidiary] at arm's length. Since fairness in this context can be equated to conduct by a theoretical, wholly independent, board of directors acting upon the matter before them, it is unfortunate that this course apparently was neither considered nor pursued. Particularly in a parent-subsidiary context, a showing that the action taken was as though each of the contending parties had in fact exerted its bargaining power against the other at arm's length is strong evidence that the transaction meets the test of fairness.[105]

Next, in *Kahn v. Lynch*, the Supreme Court addressed some uncertainty that followed *Weinberger*.[106]  Before *Lynch*, if a controlling stockholder followed *Weinberger*'s lead and formed an independent negotiating committee, there was uncertainty whether a controlling stockholder would secure a burden shift at trial or be subject to business judgment review.[107]  In *Lynch*, the Supreme Court clarified

---

[104] *Id.* at 703 (citing *Michelson v. Duncan*, 407 A.2d 211, 224 (Del. 1979)); *see In re Tesla Motors*, 298 A.3d at 706 ("*Weinberger* recognized that certain procedural devices could alter the burden of proof in a conflicted transaction . . . .").

[105] *Weinberger*, 457 A.2d at 709 n.7 (citations omitted).

[106] *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1115 (Del. 1994).

[107] *In re Tesla Motors*, 298 A.3d at 706 ("[T]his Court, in *Lynch I*, clarified the effect of certain procedural cleansing mechanisms in the context of controller squeeze-outs. Relying on our decisions in *Weinberger* and *Rosenblatt v. Getty Oil Co.*, we held in *Lynch I* that 'an approval of the transaction by an independent committee of directors or an informed majority of minority shareholders *shifts the burden of proof* on the issue of fairness from the controlling or dominating shareholder to the challenging shareholder-plaintiff.'" (citations omitted)).

26

that if the defendants demonstrated that the transaction was either (i) negotiated by a well-functioning special committee of independent directors or (ii) conditioned on the approval of a majority of the minority shareholders, then the burden shifted to the plaintiffs to prove that the transaction was not entirely fair.[108] The standard of review, however, did not change.

After *Lynch*, it was unclear what standard of review should apply if both protections were used. The Supreme Court resolved the uncertainty in *MFW*.[109] Entire fairness is the standard of review in transactions between a controlled corporation and a controlling stockholder when the controlling stockholder receives a non-ratable benefit. But a freeze out merger structured to include approval by a well-functioning independent committee and the affirmative vote of the fully informed and uncoerced minority stockholders will be reviewed under the business judgment standard of review.[110] If both procedural protections are established

---

[108] *Lynch*, 638 A.2d at 1116 (finding that because of the uniquely coercive presence of a controlling stockholder, "[e]ntire fairness remains the proper focus of judicial analysis in examining an interested merger, irrespective of whether the burden of proof remains upon or is shifted away from the controlling or dominating shareholder, because the unchanging nature of the underlying 'interested' transaction requires careful scrutiny." (citing *Weinberger*, 457 A.2d at 710; *Citron v. E.I. Du Pont de Nemours & Co.*, 584 A.2d 490, 502 (Del. 1990))).

[109] *Kahn v. M & F Worldwide Corp.*, 88 A.3d 635 (Del. 2014) [hereinafter *MFW*], *overruled on other grounds by Flood v. Synutra, Int'l, Inc.*, 195 A.3d 754 (Del. 2018).

[110] *Id.* at 644 ("[W]here the controller irrevocably and publicly disables itself from using its control to dictate the outcome of the negotiations and the shareholder vote, the controlled merger then acquires the shareholder-protective characteristics of third-party, arm's-length mergers, which are reviewed under the business judgment standard.").

pretrial, "the board's decision will be upheld unless it cannot be attributed to any rational business purpose."[111]

Thus, after *MFW*, the business judgment rule will apply when: (i) a controlling stockholder conditions a transaction from the start on the approval of both a special committee and a majority of the minority stockholders; (ii) the special committee is independent; (iii) the special committee is fully empowered; (iv) the special committee meets its duty of care; (v) the vote of the minority is informed; and (vi) there is no coercion of the minority.[112]  *MFW* and later cases cleared the way for defendants in controlling stockholder transactions to gain pleading-stage dismissal of complaints.[113]  *MFW* also endorsed what had been the best practice since *Weinberger* – a controlling stockholder employing procedural tools to replicate arm's length bargaining.[114]

---

[111] *City of Dearborn Police & Fire Revised Ret. Sys. v. Brookfield Asset Mgmt. Inc.*, --- A.3d ----, 2024 WL 1244032, at *12 (Del. Mar. 25, 2024) (internal quotation marks omitted) (citing *MFW*, 88 A.3d at 646; *Telsa*, 298 A.3d at 708).

[112] *MFW*, 88 A.3d at 639.

[113] *Flood*, 195 A.3d at 767 (Del. 2018) (citing *Swomley v. Schlecht*, 2014 WL 4470947, at *21 (Del. Ch. 2014), *aff'd*, 128 A.3d 992 (Del. 2015) (TABLE)) (overruling language in *MFW* which suggested that a plaintiff can challenge the effectiveness of a special committee by questioning the buyout price).

[114] The use of a special committee in conflict transactions is a best practice, not a requirement. *In re Tesla Motors*, 298 A.3d at 709 ("Although we continue to encourage the use of special negotiation committees as a 'best practice,' nothing in Delaware law *requires* a board to form a special committee in a conflicted transaction.").

A.

*Weinberger*, *Lynch*, and *MFW* were freeze out merger cases. The defendants argue that, outside that context, "[t]ime-tested traditional principles of Delaware corporate law . . . recognize that any one of three cleansing mechanisms – approval by (i) a board with an independent director majority; *or* (ii) a special committee of independent directors; *or* (iii) a majority of the unaffiliated stockholders – suffices to invoke the business judgment standard of review in a conflict transaction."[115] In other words, according to the defendants, the rule has always been that, other than freeze out mergers, any one of these three procedural devices could invoke business judgment review in controlling stockholder transactions.

We read our Supreme Court precedent differently. Our analysis starts with the common thread running through our decisions: a heightened concern for self-dealing when a controlling stockholder stands on both sides of a transaction and

---

[115] Supplemental Opening Br. at 1. The defendants contend that these cleansing mechanisms are drawn from 8 *Del. C.* § 144(a). Section 144 repealed the common law prohibition on self-dealing by directors. The statute offers a limited safe harbor for directors from incurable voidness for conflict transactions. It is not concerned with equitable review. *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 365 (Del. 1993), *modified*, 636 A.2d 956 (Del. 1994) ("Enacted in 1967, section 144(a) codified judicially acknowledged principles of corporate governance to provide a limited safe harbor for corporate boards to prevent director conflicts of interest from voiding corporate action." (citing 56 *Del.Laws*, ch. 50 (1967)); *see also* Blake Rohrbacher et al*., Finding Safe Harbor: Clarifying the Limited Application of Section 144*, 33 DEL. J. CORP L. 719, 737–38 (2008) (discussing the "overextension" of Section 144 beyond its limited scope); *In re Cox Commc'ns, Inc. S'holders Litig.*, 879 A.2d 604, 614 (Del. Ch. 2005) ("I must hasten to add that § 144 has been interpreted as dealing solely with the problem of per se invalidity; that is, as addressing only the common law principle that interested transactions were entirely invalid and providing a road map for transactional planners to avoid that fate.").

receives a non-ratable benefit. As explained earlier, in the 1988 *Summa Corp.* Supreme Court decision, which dealt with a controlling stockholder transaction not involving a freeze out merger, our Court held that "one who stands on both sides of a transaction has the burden of proving its entire fairness."[116] We observed that the conflict problem "inheres in, and invariably arises from the parent-subsidiary relationship."[117] The parent, "'by virtue of its domination of the subsidiary,'" can cause the subsidiary to confer a non-ratable benefit on the controlling parent to the detriment of the minority stockholders.[118]

*Summa Corp.* did not involve a special committee or an unaffiliated stockholder vote. But in the *Kahn v. Tremont* series of decisions, the Court of Chancery and the Supreme Court directly addressed the standard of review in non-freeze out controlling stockholder transactions.[119] In *Tremont I*, a controlling stockholder carried out a stock sale transaction between two controlled corporations. The Court of Chancery applied entire fairness review, despite approval by a special

---

[116] 540 A.2d at 406 (citing *Weinberger*, 457 A.2d at 710; *Mayflower*, 93 A.2d at 110).

[117] *Id*. at 407.

[118] *Id.* (quoting *Sinclair Oil Corp.,* 280 A.2d at 720); *see also Nixon v. Blackwell*, 626 A.2d 1366, 1374–75 (Del. 1993) (applying entire fairness where the controlling stockholders used various transactions to generate benefits for themselves that were "beyond that which benefited other stockholders generally").

[119] *Kahn v. Tremont Corp.*, 1996 WL 145452 (Del. Ch. Mar. 21, 1996) [hereinafter *Tremont I*], *rev'd on other grounds*, *Kahn v. Tremont Corp.*, 694 A.2d 422, 424 (Del. 1997) [hereinafter *Tremont II*].

committee of independent directors.[120]  In the court's decision, Chancellor Allen observed that "[d]efendants seek to limit *Lynch* to cases in which mergers give rise to the claim of unfairness, but offer no plausible rationale for a distinction between mergers and other corporate transactions and in principle I can perceive none."[121]

On appeal, in *Tremont II*, this Court reversed the Court of Chancery's conclusion that the special committee was independent.[122]  The standard of review did not depend on the nature of the transaction.  Instead, we stated that "when a controlling shareholder stands on both sides of the transaction the conduct of the parties will be viewed under the more exacting standard of entire fairness as opposed to the more deferential business judgment standard."[123]  Even in non-freeze out transactions, we explained that:

---

[120] *Tremont I*, 1996 WL 145452, at *7–8.

[121] *Id.* at *7. The defendants downplay Chancellor Allen's statement by pointing to the Chancellor's decision in *In re Trans World Airlines, Inc. S'holders Litig.*, 1988 WL 111271 (Del. Ch. Oct. 21, 1988).  In that case, the Chancellor held that "[b]oth the device of the special negotiating committee of disinterested directors and the device of a merger provision requiring approval by a majority of disinterested shareholders, when properly employed, have the judicial effect of making the substantive law aspect of the business judgment rule applicable and, procedurally, of shifting back to plaintiffs the burden of demonstrating that such a transaction infringes upon rights of minority shareholders." *Id.* at *7.  They attribute Chancellor Allen's statement in *Tremont I* to "resignation" that the Supreme Court set the rule in *Lynch* and the Chancellor was obligated to follow it.  Supplemental Opening Br. at 29–30.  We note that the Chancellor's statement in *Trans World* was over seven years before his statement in *Tremont I*. And, as the defendants recognize, the Court of Chancery, like any trial court in relation to an appellate court, was required to follow *Lynch*.  *Id.*

[122] 694 A.2d at 430.

[123] *Id.* at 428.

[T]he underlying factors which raise the specter of impropriety can never be completely eradicated and still require careful judicial scrutiny. This policy reflects the reality that in a transaction such as the one considered in this appeal, the controlling shareholder will continue to dominate the company regardless of the outcome of the transaction. The risk is thus created that those who pass upon the propriety of the transaction might perceive that disapproval may result in retaliation by the controlling shareholder.[124]

Thus, in *Tremont II*, we held that, under *Lynch*, even if an independent committee negotiates a transaction involving a controlling stockholder who receives a non-ratable benefit, entire fairness is the standard of review:

[E]ven when the transaction is negotiated by a special committee of independent directors, "no court could be certain whether the transaction fully approximate[d] what truly independent parties would have achieved in an arm's length negotiation." [*Citron v. E.I. Du Pont de Nemours & Co.*, Del. Ch., 584 A.2d 490, 502 (1990)]. Cognizant of this fact, we have chosen to apply the entire fairness standard to "interested transactions" in order to ensure that all parties to the transaction have fulfilled their fiduciary duties to the corporation and all its shareholders. [*Lynch*], 638 A.2d at 1110.[125]

The same is true in later Supreme Court controlling stockholder cases not involving freeze out mergers. In *Emerald Partners v. Berlin*, this Court held that "an approval of the transaction by an independent committee of directors who have real bargaining power . . . may supply the necessary basis for shifting the burden" and that "the approval of the transaction by a fully informed vote of a majority of

---

[124] *Id.* (citations omitted).

[125] *Id.* at 428–29.

the minority shareholders will shift the burden."[126]  This Court did not change the standard of review.  In *Ams. Mining Corp. v. Theriault*, we held that "in order to encourage the use of procedural devices that foster fair pricing, such as special committees and minority stockholder approval conditions, this Court has provided transactional proponents with . . . the shifting of the burden of persuasion on the ultimate issue of entire fairness to the plaintiffs."[127]  This Court did not change the standard of review.  And in *Levco Alt. Fund Ltd. v. Reader's Dig. Ass'n, Inc.*, where we reviewed a plaintiff's request to enjoin a recapitalization where a controlled corporation would repurchase its controlling stockholder's Class B shares, we held that the burden of entire fairness "may shift, of course, if an independent committee of directors has approved the transaction."[128]  This Court did not change the standard of review.[129]

1.

The defendants offer several counters to what is a straight-forward reading of *Tremont II*, *Emerald Partners*, *Levco*, and *Ams. Mining*.  First, they argue that the

---

[126] 726 A.2d 1215, 1222–23 (Del. 1999).

[127] 51 A.3d 1213, 1242 (Del. 2012) [hereinafter *Ams. Mining*].

[128] 803 A.2d 428, 2002 WL 1859064, at *2 (Del. Aug. 13, 2002) (TABLE) (citing *Emerald Partners*, 726 A.2d 1215, 1221 (Del. 1999)).

[129] *See also In re Tesla Motors*, 298 A.3d 667 (applying entire fairness to a non-freeze out merger); *Olenik v. Lodzinski*, 208 A.3d 704 (Del. 2019) (same); *In re Invs. Bancorp, Inc. S'holder Litig.*, 177 A.3d 1208 (Del. 2017) (applying entire fairness to director compensation).

parties in those cases assumed that both procedural devices were needed to invoke the business judgment standard of review.[130] Stated another way, they claim that, in those cases, the parties and the Supreme Court misunderstood or were unaware of the "traditional principles" outside of freeze out transactions. As an example, they point to *Ams. Mining*, where none of the five issues on appeal related to the standard of review.[131]

It is correct that throughout the lifecycle of *Ams. Mining*, the parties, the Court of Chancery, and this Court all agreed that *Tremont II* established the governing law.[132] But rather than chalking it up to a misunderstanding of the law by the parties and the courts, it is more reasonable to assume that all knew that *Tremont II* was settled law.[133] The same is true for *Emerald Partners* and *Levco*. The Supreme

---

[130] Supplemental Opening Br. at 30 n.25; Supplemental Reply Br. at 25 n.22.

[131] 51 A.3d at 1218–19 (appealing the denial of the opportunity to present a witness, the failure to determine who bore the burden of proof before trial, the ultimate allocation of the burden on the defendants despite the use of a special committee, the determination of fair price as arbitrary and capricious, and the award of damages as being unsupported by the record, and the attorneys' fees).

[132] *Id.* at 1240–41; *In re S. Peru Copper Corp. S'holder Deriv. Litig.*, 52 A.3d 761, 787 (Del. Ch. 2011) *aff'd*, *Ams. Mining*, 51 A.3d 1213 ("Consistent with the Supreme Court's decision in *Kahn v. Tremont*, both the plaintiff and the defendants agree that the appropriate standard of review for the Merger is entire fairness, regardless of the existence of the Special Committee.").

[133] In *Ams. Mining*, despite a special committee of independent directors negotiating the business transaction, the Court of Chancery could not make a pretrial determination that the committee exercised real bargaining power. 51 A.3d at 1240–41. We highlighted this as a "perfect example" of the potential for "impropriety," with the court finding that the committee, though fully independent, was influenced by the controlling stockholder and thus failed to shift the burden of persuasion. *Id.* (quoting *Tremont II*, 694 A.2d at 428).

Court's consistent statement of the law in these decisions is not, as the defendants attempt to characterize it, *obiter dictum*.[134]

2.

The defendants rely heavily on *Williams v. Geier*, where we affirmed the Court of Chancery's business judgment review of a recapitalization that involved a charter amendment that provided for a form of tenure voting.[135] Under the tenure voting plan, common stockholders would receive ten votes per share, and upon a sale or transfer, each share would revert to one vote per share if held for three years. The controlling stockholder group and corporate officers implemented the recapitalization, which included charter amendments implementing tenure voting.[136] A majority independent board approved the recapitalization. This Court agreed with the Court of Chancery that the standard of review was business judgment.[137]

An important aspect of *Williams* limits its relevance here. It is correct that the recapitalization involved a controlling stockholder group, a majority independent

---

[134] *See In re Fox Corp./Snap Inc.*, 2024 WL 176575, at *11 (Del. Jan. 17, 2024) ("[A] court's ruling is rarely limited to the specific facts before it.").

[135] 671 A.2d 1368, 1370 (Del. 1996).

[136] *Id.* at 1372.

[137] *Id.* at 1376 ("The record does not rebut the business judgment rule presumption that the Board acted independently, with due care, in good faith and in the honest belief that its actions were in the stockholders' best interests."). This Court, for purposes of the opinion's legal analysis, assumed but did not decide whether there was a controlling stockholder group.

35

board approved the act, and the Court ultimately applied business judgment review. It is also correct that the controlling stockholders "reap[ed] a benefit" from the transaction.[138] But the *Williams* majority also concluded that "no non-pro rata [sic] or disproportionate benefit. . . accrued to the [controlling stockholders] on the face of the Recapitalization, although the dynamics of how the Plan would work in practice had the effect of strengthening the [controlling stockholders'] control."[139] In other words, the majority, over the dissent's contrary view, found that "[t]he Recapitalization applied to every stockholder, whether a stockholder was a minority stockholder or part of the majority bloc."[140] Entire fairness review did not apply because the controlling stockholders received the same benefit as other stockholders.[141]

3.

The defendants contend that *MFW* "essentially rejected the inherent coercion theory."[142] They argue that this Court in *MFW* limited the dual procedural

---

[138] *Id.* at 1381–82.

[139] *Id.* at 1378.

[140] *Id.* at 1370.

[141] *See Sinclair Oil Corp.*, 280 A.2d at 720 ("Self-dealing occurs when the parent, by virtue of its domination of the subsidiary, causes the subsidiary to act in such a way that the parent receives something from the subsidiary to the exclusion of, and detriment to, the minority stockholders of the subsidiary.").

[142] Supplemental Opening Br. at 21.

36

requirements to freeze out mergers because the Court sought to solve a specific problem: a controlling stockholder's ability to bypass the board through a tender offer.[143] In other words, if the board disagreed with the controlling stockholder, it could bypass the board and make a tender offer directly to the stockholders.[144] Outside this context, the defendant's claim, the "traditional principles" apply.

The *MFW* fact pattern did involve a freeze out merger. And bypass was a concern. But we cannot find any statement in *MFW* that distances our law in any transactional setting from the inherent coercion described in *Lynch*. Instead, in *MFW* we noted that a controlling stockholder generally has inherently coercive authority over the board and the minority stockholders.[145] To make a pretrial showing of arm's length negotiation, a controlling stockholder must "irrevocably and publicly disable[] itself from using its control to dictate the outcome of the negotiations and

---

[143] *Id.* at 18.

[144] *See In re Siliconix Inc. S'holders Litig.*, 2001 WL 716787, at *16 & n.82 (Del. Ch. June 19, 2001) (controlling stockholder did not have to demonstrate the entire fairness of a proposed freeze out tender offer). *See also In re CNX Gas Corp. S'holders Litig.*, 4 A.3d 397, 413 (Del. Ch. 2010) (declining to follow *Siliconix* and applying entire fairness to a freeze out tender offer unless the tender offer was "(i) negotiated and recommended by a special committee of independent directors and (ii) conditioned on the affirmative tender of a majority of the minority shares, then the business judgment standard of review presumptively applies to the freeze-out transaction." (citing *In re Cox Commc'ns, Inc. S'holders Litig.*, 879 A.2d at 607)).

[145] *MFW*, 88 A.3d at 644 ("[E]ntire fairness is the highest standard of review in corporate law. It is applied in the controller merger context as a substitute for the dual statutory protections of disinterested board and stockholder approval, because both protections are potentially undermined by the influence of the controller.").

the shareholder vote" to restore the business judgment rule's protections.[146] We also relied on *Tremont II* for the broad statement that "[w]here a *transaction* involving self-dealing by a controlling stockholder is challenged, the applicable standard of judicial review is 'entire fairness,' with the defendants having the burden of persuasion."[147]

The defendants also claim that the *Lynch* rationale for entire fairness review is obsolete because institutional investors can protect minority stockholders from controlling stockholders.[148] They also argue that experience has shown that independent directors can serve as an effective check on a controlling stockholder's influence. We note, however, that these points have long been subject to debate and are thus not something to be decided in this appeal on the record before us.[149] In any

---

[146] *Id*. The defendants argue that two Court of Chancery cases – *In re Pure Res., Inc., S'holders Litig.* and *In re Cox Commc'ns, Inc. S'holders Litig.* – supposedly exposed the flaws with *Lynch*'s rationale. 808 A.2d 421 (Del. Ch. 2002); 879 A.2d 604. *Pure Resources* observed that if controlling stockholder tender offers were not reviewed under the entire fairness standard, then *Lynch*'s understanding of inherent coercion was counterintuitive because it incentivized bypass – the very act it sought to prevent. 808 A.2d at 441–43. As the Court of Chancery has noted in other cases, however, this Court has not directly addressed the standard of review for a freeze out tender offer following *Lynch*. *In re CNX Gas Corp. S'holders Litig.*, 4 A.3d at 413. In *Cox*, the Court of Chancery answered its concerns by suggesting that it would review controlling stockholder tender offers under similar equitable standards as a freeze out merger. 879 A.2d at 606, 623–24.

[147] *MFW*, 88 A.3d at 642 & n.5 (emphasis added) (citing *Tremont II*, 694 A.2d at 428; *Weinberger*, 457 A.2d at 710).

[148] Supplemental Opening Br. at 20–21.

[149] *See, e.g.*, Ronald J. Gilson & Jeffrey N. Gordon, *The Agency Costs of Agency Capitalism: Activist Investors and the Revaluation of Governance Rights*, 113 COLUM. L. REV. 863 (2013) (arguing that the shift from widely distributed ownership to concentrated institutional ownership has resulted in the perpetuation of the principal-agent problem, first between stockholders and

38

event, *Lynch* and *Tremont II* remain the controlling precedent, and we have not been

asked to overrule them.[150]

---

managers, and second between beneficial owners and institutional stockholders); Ann M. Lipton, *Shareholder Divorce Court*, 44 J. CORP. L. 297, 298 (2018) (finding that "due to the increasing consolidation of the shareholder base, powerful investors may be as conflicted as directors, and may therefore have no interest in driving a hard bargain" where a fiduciary engages in a conflict transaction); Stephen Choi *et al.*, *The Power of Proxy Advisors: Myth or Reality*, 59 Emory L.J. 869, 906 (2010) (finding that proxy advisors' influence on corporate governance has been "substantially overstated"); Lucian A. Bebchuk & Assaf Hamdani, *Independent Directors and Controlling Shareholders*, 165 U. PA. L. REV. 1271 (2017) (arguing that independent directors are not an effective check against a controlling stockholder engaging in a conflict decision because of the reality that the election and retention of independent directors depends on the controlling stockholder). The defendants also do not account for the many microcap corporations incorporated in Delaware, where they "are not covered by a single analyst." Amicus Br. of Alpha Venture Capital Management, LLC at 7 (citing Annalisa Barret, *Microcap Board Governance*, IRRC INSTITUTE at 7 (Aug. 2018)). Additionally, as the Academics point out, most Delaware corporations are privately held. Amicus Br. of Academics at 5.

[150] The defendants rely on other Supreme Court and Court of Chancery cases for the proposition that *Lynch* and therefore *MFW* do not apply outside the freeze out context. Many of the cases, however, either applied entire fairness review or did not expressly find that a controlling stockholder stood on both sides of a transaction and received a non-ratable benefit. *See Puma v. Marriott*, 283 A.2d 693, 694–95 (Del. Ch. 1971) (applying the business judgment rule because, among other things, the plaintiffs did not demonstrate that a large stockholder was a controlling stockholder); *Getty Oil Co. v. Skelly Oil Co.*, 267 A.2d 883 (Del. 1970) (applying the business judgment rule because the Federal Government, rather than the controlling stockholder, set the terms of the transaction); *Johnston v. Greene*, 121 A.2d 919, 925 (Del. 1956) ("The refusal of the directors . . . to buy the patents was, under the Chancellor's finding, a transaction between the dominating director and his corporation. It is therefore subject to strict scrutiny, and the defendants have the burden of showing that it was fair."); *Orman v. Cullman*, 794 A.2d 5, 22 (Del. Ch. 2002) (applying the business judgment rule because the controlling stockholder "did not stand on both sides of the challenged merger" initiated by an unaffiliated third party and negotiated by independent directors); *Solomon v. Armstrong*, 747 A.2d 1098, 1123 (Del. Ch. 1999), *aff'd*, 746 A.2d 277, 2000 WL 140072 (Del. Jan. 26, 2000) (TABLE) (applying the business judgment rule after finding that the minority stockholders' strong contractual rights rendered the parent corporation unable to fix the terms of the transaction or to retaliate in any capacity and therefore, "both the form and the substance of the transaction in this case is radically different from a parent-subsidiary freeze-out merger or any other transaction with a controlling shareholder"); *Lewis v. Hat Corp. of Am.*, 150 A.2d 750, 752 (Del. Ch. 1959) (stockholder approval cleansed "director self-dealing" transaction approved by a majority independent board and "negotiated by a committee of directors not allied to the [interested directors] notwithstanding the fact that such [directors] owned or controlled 42.7% of the common stock").

4.

Finally, the defendants argue that we cannot square the circle between entire fairness review for non-freeze out conflicted controlling stockholder transactions and our controlling stockholder demand review precedent.[151] In *Lynch* and *Tremont II,* we held that, because of the inherently coercive presence of a controlling stockholder and the perceived risk of retaliation, the use of an independent and properly functioning special committee did not replicate arm's length bargaining and change the entire fairness standard of review. But according to our demand review precedent in *Aronson,* which involved derivative claims against a controlling stockholder, inherent coercion alone did not excuse demand.[152] The defendants argue that if inherent coercion does not disable an independent director's ability to decide whether the corporation should sue a controlling stockholder, then consistency requires that inherent coercion not be presumed in business transaction negotiations with controlling stockholders.

Admittedly, there is a tension in our law in these contexts. But *Aronson* and our demand review precedent stand apart from the substantive standard of review in controlling stockholder transactions. The distinction is grounded in the board's

---

[151] Supplemental Opening Br. at 32.

[152] 473 A.2d 805 (Del. 1984).

statutory authority to control the business and affairs of the corporation, which encompasses the decision whether to pursue litigation.

In *Zuckerberg*, we held that layering entire fairness review over our demand review precedent "collapses the distinction between the board's capacity to consider a litigation demand and the propriety of the challenged transaction."[153] An "independent and disinterested board" can decide "that it is not in the corporation's best interest to spend the time and money to pursue a claim that is likely to succeed."[154] To divest the board of authority over a derivative litigation, however, even when it involves a controlling stockholder, "runs counter to the 'cardinal precept' of Delaware law that independent and disinterested directors are generally in the best position to manage a corporation's affairs, including whether the corporation should exercise its legal rights."[155]

Although *Zuckerberg* focused on the effect of the substantive standard of review on the demand requirement, its teachings have general application here. Court of Chancery Rule 23.1 and the demand review requirement stem from the

---

[153] *United Food & Com. Workers Union & Participating Food Indus. Emps. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1056 (Del. 2021).

[154] *Id.*

[155] *Id.* (quoting *Aronson*, 473 A.2d at 811).

board's authority over the corporation under Delaware corporate law.[156]  Under *Aronson*, demand is not excused for the sole reason that entire fairness is the standard of review in a controlling stockholder transaction.  But *Lynch*, *Tremont II* and later cases control the substantive standard of review in a case alleging that a controlling stockholder stood on both sides of a transaction and received a non-ratable benefit.[157]

## B.

Old IAC was Old Match's controlling stockholder during the Separation.[158]  As alleged in the complaint, in carrying out the Separation, "IAC . . . deliberately

---

[156]  *See Diep ex rel. El Pollo Loco Holdings, Inc. v. Trimaran Pollo Partners, L.L.C.*, 280 A.3d 133, 149 (Del. 2022) ("Like a fleet of trucks or a factory, a lawsuit is a corporate asset that must be managed by the board consistent with its fiduciary duties.").

[157] *See also In re EZCORP Inc. Consulting Agreement Deriv. Litig.*, 2016 WL 301245, at *30 (Ct. Ch. Jan. 25, 2016) ("[T]he rulings in *Aronson*—at least in their pure form—stand out amidst other Delaware decisions. . . . I would continue to limit *Aronson's* scope to demand futility . . . ."); *Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 2015 WL 4192107 at *17 (Del. Ch. July 13, 2015) ("[T]he potential that the entire fairness standard may govern Plaintiff's breach of fiduciary duty claim against . . . an alleged controlling stockholder … does not remove that claim, or any of the other derivative claims … from the purview of the Demand Board to decide for themselves under 8 *Del. C*. § 141(a) whether to exercise the Company's right to bring such a claim. The focus instead, as explained in *Aronson* and repeated in *Beam*, is on whether Plaintiff's allegations raise a reasonable doubt as to the impartially of a majority of the Demand Board to have considered such a demand."). The defendants cite two post-*Tremont II* Court of Chancery cases where the court applied business judgment review to executive compensation decisions involving controlling stockholders. *See In re Tyson Foods, Inc.*, 919 A.2d 563 (Del. Ch. 2007) (applying the business judgment review to a stockholder's challenge of a corporation's consulting agreement with its controlling stockholder); *Friedman v. Dolan*, 2015 WL 4040806 (Del. Ch. June 30, 2015) (the same for compensation of controlling stockholders who were the executive chairman and the CEO of the corporation). Both cases relied on *Aronson* to invoke the business judgment standard of review which, as noted above, we have confined to the demand review context.

[158] At the time of the Separation, IAC held 98.2% of Match's voting power.  A62 (Proxy at 1); A892.

42

advanced [its] own interests[] to the detriment and expense of the [Old Match] minority stockholders, in breach of their fiduciary duties."[159]  The presumptive standard of review is entire fairness, unless the defendants can satisfy *all* of *MFW*'s requirements to change the standard of review to business judgment.

## IV.

The Court of Chancery decided that the Separation adhered to *MFW*'s requirements, applied the business judgment rule standard of review, and dismissed the complaint.  Based on the facts as pleaded, it found that, although one Committee member – McInerney – was conflicted, a majority of the Separation Committee was

---

[159] A869 (Am. Compl. ¶ 230). As an alternative ground for affirmance, the defendants argue that the plaintiffs failed to plead "economic fairness," meaning that they had to plead "'why' the terms alleged to be 'unfair' were unfair." Answering Br. of Barry Diller *et al.* at 25.  According to the defendants, the plaintiffs only make conclusory allegations of "unfairness" without explaining why the bargain was unfair.  In our view, the plaintiffs have sufficiently pleaded unfairness to satisfy their burden at the motion to dismiss stage.  Under Court of Chancery Rule 12(b)(6), in an entire fairness case, "the plaintiff must plead facts that, with all reasonable inferences drawn in their favor, show the transaction was unfair." *Olenik*, 208 A.3d at 719 n.74 (citing *Solomon v. Pathe Commc'ns Corp.*, 672 A.2d 35, 38 (Del. 1996)).  The plaintiffs pleaded:  Old IAC controlled Old Match, A769 (Am. Compl. ¶ 35); the Old Match board squandered negotiating leverage by acceding to pre-negotiation acts by Old IAC to protect the tax-free treatment of the Separation without any consideration to Old Match, A784–86 (Am. Compl. ¶¶ 59–63); the Separation Committee and Old Match board were conflicted, A784, 786 (Am. Compl. ¶¶ 59, 67); the Separation Committee hired a conflicted financial advisor, A796 (Am. Compl. ¶ 78); the Separation Committee did not properly represent Old Match and its stockholders by incurring significant leverage as a result of the Separation, A804, 836 (Am. Compl. ¶¶ 94, 157); the Separation skewed heavily in favor of Old IAC as the Old Match board and Separation Committee could not separate the interests of Old Match from Old IAC, A840 (Am. Compl. ¶ 164); the Separation's governance terms rendered New Match *de facto* controlled by New IAC in the near term, A844–45 (Am. Compl. ¶¶ 170, 171); and Old IAC and the Old Match board issued a materially false and misleading proxy to secure approval of the Separation, A841–46 (Am. Compl. ¶¶ 165–78).  As a result of these allegedly ineffective negotiations by the conflicted Separation Committee and Old Match board, Old Match overcompensated Old IAC and its stockholders, to the detriment of Old Match and its minority stockholders.  A847 (Am. Compl. ¶ 179).

independent, and McInerney did not "infect" or "dominate" the separation committee process.[160] The court also decided that the proxy statement adequately disclosed McInerney's conflicts.[161]

On appeal, the plaintiffs argue that the Court of Chancery's *MFW* analysis was flawed on two grounds – the Separation Committee lacked independence, and the proxy statement disclosures were inadequate.[162] They contend that, if the goal is to replicate arm's length negotiation, each Separation Committee member must be independent. In the alternative, they claim that McInerney, a conflicted committee member, dominated or controlled the negotiation process. As for disclosure, the plaintiffs argue that the proxy statement did not adequately disclose McInerney's conflicts.

To begin with, we agree with the Court of Chancery that McInerney lacked independence. McInerney worked at IAC from 1999 to 2012 – including a seven-year term as IAC's CFO.[163] The plaintiffs alleged that he earned over $55 million during his employment at IAC, which began when he was 35 years old.[164] They also

---

[160] *In re Match*, 2022 WL 3970159, at *19.

[161] *Id.* at *29.

[162] Opening Br. at 6.

[163] B231.

[164] A762 (Am. Compl. ¶ 17).

alleged that IAC was his primary employment for over a decade. When McInerney announced his departure from IAC, he stated that he was "more than grateful to Barry Diller for the opportunities he and IAC have given me."[165] And Diller said of McInerney that he held "total respect for [McInerney's] ability, trustworthiness, and decency."[166] McInerney also served as a director of various IAC-affiliated companies since 2008, including Old Match.[167] The plaintiffs alleged that McInerney earned over $4.5 million in compensation from his service on those boards.[168]

Longstanding business affiliations, particularly those based on mutual respect, are of the sort that can undermine a director's independence.[169] Directors who owe

[165] *Thomas J. McInerney to Step Down as IAC CFO*, PR NEWSWIRE (Aug. 11, 2011, 8:00 AM), https://www.prnewswire.com/news-releases/thomas-j-mcinerney-to-step-down-as-iac-cfo-127514003.html.

[166] *Id.*

[167] B231; A789 (Am. Compl. ¶69) ("In May 2008, McInerney was appointed to the board of directors of ILG, where he served until September 2018. In August 2008, McInerney joined the board of directors of HSN, where he served until December 2017. In November 2015, McInerney joined the Match Board. After leaving IAC, McInerney was a "personal investor" from 2012 to 2017."). The defendants argue that the ILG and HSN relationships are irrelevant because both entities were spun-off from Old IAC in 2008, and after that were not "Old IAC affiliates." Answering Br. of Sharmistha Dubey *et al*. at 18. That point does not change the reasonable inference that McInerney acquired those posts, which he kept for a decade, by virtue of his affiliation with IAC.

[168] A789 (Am. Compl. ¶69).

[169] *Marchand v. Barnhill*, 212 A.3d 805, 808 (Del. 2019) (reversing a court's ruling that demand was not futile by finding there was reasonable doubt as to whether a director could act impartially in deciding whether to sue a CEO due to the director's "longstanding business affiliation and personal relationship with the [CEO's] family"); *id.* at 819 (finding that "personal ties of respect,

their success to another will conceivably feel as though they owe a "debt of gratitude" to the individual.[170] The plaintiffs have adequately pleaded that McInerney may have such a relationship with IAC and Diller – one with "personal ties of respect, loyalty, and affection" – and it is therefore a reasonable inference that he was not independent of Old IAC when negotiating the Separation.[171]

Next, the Court of Chancery found that the Separation Committee adhered to *MFW* as only a majority of the committee had to be independent. According to the court, the plaintiffs had not pleaded that the other two committee members lacked independence. And, the court found, the plaintiffs did not plead that McInerney "dominated" or "infected" the Committee's decision-making process.[172]

---

loyalty, and affection" between a director and CEO created "a reasonable doubt" that the director was impartial).

[170] *Id.* at 820 (discussing the inference that the director "owe[d] an important debt of gratitude" to the CEO's family for "giving him his first job[ and] nurturing his progress from an entry level position to a top manager and director"); *Delaware Cnty. Emps. Ret. Fund v. Sanchez*, 124 A.3d 1017, 1023 (Del. 2015) (finding that a longstanding business relationship, with a large economic benefit, supported an inference that a director was not independent from the CEO's family).

[171] The defendants argue that McInerney's success after leaving IAC as the CEO of Altaba between 2017 and 2021 "undercuts any reasonable inference that McInerney's alleged financial ties to IAC would impugn his independence." Answering Br. of Sharmistha Dubey *et al*. at 22. Therefore, McInerney was not financial beholden to IAC. *Id*. at 23. As alleged, however, McInerney's close and pervasive relationship with IAC and Diller are what undercut his independence. McInerney's success resulting directly or indirectly from his relationship with IAC speaks to the "debt of gratitude" he owes to IAC and Diller for his own success. *Marchand*, 212 A.3d at 820.

[172] *Id.* at *29.

We disagree with the Court of Chancery that only a majority of the Separation Committee must be independent. First, the cases it relied on are distinguishable. In *In re Dell Techs. Inc. Class V S'holders Litig.*, the Court of Chancery decided that, because one member of a two-member committee was conflicted, the defendants did not satisfy *MFW*'s requirements.[173] The failure of the two-person committee does not rule out the need for a wholly independent committee.[174] And in *Voigt v. Metcalf*, the court did state that "the business judgment rule would still apply if the Board relied on the Committee's recommendation, unless the Committee itself lacked a disinterested and independent majority."[175] But *Voigt*'s reference to a board majority was based on a hypothetical with no controlling stockholder.[176]

The defendants rely on *City Pension Fund for Firefighters & Police Officers in the City of Miami v. The Trade Desk, Inc.*[177] There, the Court of Chancery recently held that a *MFW* special committee was independent, despite the challenge to the

[173] 2020 WL 3096748, at *35 (Del. Ch. June 11, 2020) [hereinafter *Dell*].

[174] *See Franchi v. Firestone*, 2021 WL 5991886, at *4 (Del. Ch. May 10, 2021) ("'If the complaint supports a reasonable inference that [any] member [of the special committee] was not disinterested and independent, then the plaintiffs have called into question this aspect of the *MFW* requirements.'" (modifications in original) (quoting *Dell*, 2020 WL 3096748, at *35)).

[175] 2020 WL 614999, at *10 (Del. Ch. Feb. 10, 2020).

[176] *Id.*

[177] 2022 WL 3009959 (Del. Ch. July 29, 2022).

47

committee chair's independence.[178]  In their submissions, the plaintiffs – as the defendants here acknowledge – did not address whether *MFW* requires full independence of the special committee.  Accordingly, the court held that they waived their right to challenge the committee's independence because it was not wholly independent.[179]

In contexts other than those involving a controlling stockholder, forming a special committee is a delegation of the board's general authority to a subset of its directors.[180]  Consequently, akin to the board itself, majority independence is not a requirement.  To apply the business judgment rule when a controlling stockholder transacts with the corporation and receives a non-ratable benefit, however, the inherently coercive presence of the controlling stockholder requires it to "irrevocably and publicly disable[] itself from using its control to dictate the outcome of the negotiations" to ensure an "arm's-length" outcome.[181]  A controlling stockholder's influence is not "disabled" when the special committee is staffed with members loyal to the controlling stockholder.  We stated in *MFW* that the special committee must be independent, not that only a majority of the committee must be

---

[178] *Id*. at *13.

[179] *Id.* at *13 n.130.

[180] *Spiegel v. Buntrock*, 571 A.2d 767, 776 (Del. 1990) ("A board of directors may delegate its managerial authority to a committee of directors." (citing 8 *Del. C.* § 141(c)).

[181] *MFW*, 88 A.3d at 644.

48

independent.[182]   And, as we stated in *Weinberger*, fairness "can be equated to conduct by a theoretical, *wholly independent*, board of directors acting upon the matter before them."[183]

A special committee created to secure the protections of *MFW* should function "in a manner which indicates that the controlling stockholder did not dictate the terms of the transaction and that the committee exercised real bargaining power at an arm's length."[184]   Because the complaint pleads particularized facts that raise a reasonable doubt as to McInerney's independence from Old IAC and therefore the entire Separation Committee's independence, we reverse the Court of Chancery's decision to apply the business judgment rule and dismiss the plaintiffs' claims. Entire fairness remains the standard of review.[185]

---

[182] *Id.* at 644–45.  The Court of Chancery held that "the *MFW* special committee was, as a matter of law, comprised entirely of independent directors."  *In re MFW S'holders Litig.*, 67 A.3d 496, 514 (Del. Ch. 2013), *aff'd*, *MFW*, 88 A.3d 635.

[183] 457 A.2d at 711 n.7 (emphasis added).

[184] 88 A.3. at 646 (citing *Tremont II*, 694 A.2d at 429); *Weinberger*, 457 A.2d at 709 n.7.

[185] The plaintiffs have also challenged the Court of Chancery's ruling that McInerney's conflicts were adequately disclosed in the Proxy.  In light of our ruling that it is reasonably conceivable that the Separation Committee lacked independence, on remand the Court of Chancery is free to consider the impact of our decision on the disclosure issues.

V.

Under Delaware law, if a plaintiff is no longer a stockholder by reason of a merger, it loses standing to continue a derivative suit.[186] There are two exceptions to the rule: (1) a transaction alleged to be fraudulent to eliminate stockholder standing to bring or maintain a derivative action; and (2) where the merger is effectively a reorganization that does not change the stockholder's relative ownership in the post-merger enterprise.[187]

The Court of Chancery ruled that, after the reverse spinoff, when Old Match was merged out of existence, Hallandale lacked derivative standing to bring claims on behalf of Old Match. The court found that: (1) the minority stockholders received a slightly higher percentage of ownership of New Match; (2) Old Match was capitalized in a vastly different way, with limited cash, much higher debt, and restrictive governance provisions; and (3) the boards were different.[188] As the court observed, "[i]ndeed, Plaintiffs' theory of wrongdoing is that the Separation left . . . [New] Match public stockholders holding equity in a company with different ownership and inferior assets than the company in which they chose to invest."[189]

---

[186] *Arkansas Tchr. Ret. Sys. v. Countrywide Fin. Corp.*, 75 A.3d 888, 894 (Del. 2013) (citing *Lewis v. Anderson*, 477 A.2d 1040, 1047 (Del. 1984)).

[187] *Id.*

[188] *In re Match*, 2022 WL 3970159, at *13.

[189] *Id.*

On appeal, Hallandale limits its grounds for error to the "mere reorganization" exception to derivative standing. It argues once again that the Separation did not meaningfully affect its ownership in the business enterprise because they continue to own, in New Match, the same operating business and income-producing assets of Old Match.[190] We are unpersuaded for the same reasons explained by the Court of Chancery. Hallandale's New Match stock represents a different financial interest than its Old Match stock.[191] The Separation was "far more than a corporate reshuffling."[192] New Match received the Exchangeables, an expanded board with different board members, and a different capital structure with a single class of stock instead of two. It is not reasonably conceivable that the Separation was a mere reorganization of Match.[193]

---

[190] Opening Br. at 45.

[191] *Accord Lewis v. Ward*, 852 A.2d 896, 904 (Del. 2004) ("As a consequence the shares held by plaintiffs represent property interests also distinctly different from that which they held as shareholders of Southern Pacific." (quoting *Bonime v. Biaggini,* 1984 WL 19830, at *3 (Del. Ch. Dec. 7, 1984)).

[192] *Id*; *see also Jamie Goldenberg Komen Revocable Tr. U/A/D June 10, 2008 v. Breyer*, 2020 WL 3484956, at *15 (Del. Ch. June 26, 2020) (holding that the Fox spinoff was not a mere reorganization because only a portion of Old Fox's assets were transferred to New Fox and the composition of the New Fox board was different).

[193] Relying on *Schreiber v. Carney*, Hallandale argues that the percentage of ownership change from Old and New Match is negligible. 447 A.2d 17, 22 (Del. Ch. 1982). But the old and new companies in *Schreiber* were "virtually identical" except for the slight change in one shareholder's ownership percentage. *Id.* ("The structure of the old and new companies is virtually identical except for a slight dilution in the overall stock holdings occasioned by Jet Capital's exercise of its warrants.").

51

## VI.

Finally, Diller argues on appeal that he was not a fiduciary of Old Match and therefore should be dismissed from the case. Although the issue was raised below, it became moot once the Court of Chancery dismissed the complaint. Now that the case will be remanded, the Court of Chancery should have the opportunity to decide his dismissal motion in the first instance.

## VII.

The judgment of the Court of Chancery is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.